## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SHAUN A. HOUSE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | **CLASS ACTION COMPLAINT FOR** |
| AKORN, INC., JOHN N. KAPOOR, KENNETH S. ABRAMOWITZ, ADRIENNE L. GRAVES, RONALD M. JOHNSON, STEVEN J. MEYER, TERRY A. RAPPUHN, BRIAN TAMBI, and ALAN WEINSTEIN, | ) ) ) ) ) ) ) | **VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

Plaintiff Shaun A. House ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Akorn, Inc. ("Akorn" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Akorn, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, Regulation G, 17 C.F.R. § 244.100, and 17 C.F.R. § 229.1015(b)(4) in connection with the proposed merger (the "Proposed Merger") between Akorn, Fresenius Kabi AG ("Parent"), and Quercus Acquisition, Inc. ("Merger Sub," and together with Parent, "Fresenius").

2.      On April 24, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $34.00 in cash for each share of Akorn common stock they own (the "Merger Consideration").

3.      On May 22, 2017, the Board authorized the filing of a materially incomplete and misleading Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; (ii) the valuation analyses performed by the Company's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"), in support of its fairness opinion; and (iii) potential conflicts of interest J.P. Morgan faced as a result of its prior dealings with parties on both sides of the merger.

6.      The special meeting of Akorn shareholders to vote on the Proposed Merger is forthcoming. It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Regulation G, 17 C.F.R. § 244.100. Plaintiff seeks to enjoin Defendants from holding the

shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Akorn shareholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice. More specifically, Akorn is a corporation organized and existing under the laws of the State of Louisiana and the Individual Defendants are directors of a corporation organized and existing under the laws of the State of Louisiana.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place or had an effect in this District; (ii) Akorn maintains its domicile in this District; (iii) Akorn maintains its registered agent within this District; and (iv) Defendants have engaged  in numerous activities that had an effect in this District.

## PARTIES

11.      Plaintiff is, and at all relevant times has been, a Akorn shareholder.

12. Defendant Akorn is a Louisiana corporation and maintains its headquarters at 1925 West Field Court, Suite 300, Lake Forest, Illinois 60045. Akorn develops, manufactures and markets generic and branded prescription pharmaceuticals, branded as well as private-label over-the-counter consumer health products, and animal health pharmaceuticals. Akorn's common stock trades on the NASDAQ under the ticker symbol "AKRX".

13. Individual Defendant John N. Kapoor is a director of Akorn and is the Chairman of the Board.

14. Individual Defendant Kenneth S. Abramowitz is, and has been at all relevant times, a director of the Company.

15. Individual Defendant Adrienne L. Graves is, and has been at all relevant times, a director of the Company.

16. Individual Defendant Ronald M. Johnson is, and has been at all relevant times, a director of the Company.

17. Individual Defendant Steven J. Meyer is, and has been at all relevant times, a director of the Company.

18. Individual Defendant Terry A. Rappuhn is, and has been at all relevant times, a director of the Company.

19. Individual Defendant Brian Tambi is, and has been at all relevant times, a director of the Company.

20. Individual Defendant Alan Weinstein is, and has been at all relevant times, a director of the Company.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Akorn (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of April 28, 2017, there were approximately 124,555,268 shares of Akorn common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Akorn will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## <u>SUBSTANTIVE ALLEGATIONS</u>

I.      **The Merger Consideration Appears Inadequate in Light of Akorn's Recent Financial Performance**

23.     Akorn, incorporated on January 20, 1971, is a specialty generic pharmaceutical company that develops, manufactures and markets generic and branded prescription pharmaceuticals, as well as private-label over-the-counter (OTC) consumer health products and animal health pharmaceuticals. The Company operates through two segments: Prescription Pharmaceuticals and Consumer Health. The Company is engaged in the development, manufacturing and marketing of generic pharmaceutical products in alternative dosage forms. It is focused on sterile and non-sterile dosage forms including, ophthalmics, injectables, oral

liquids, topicals, inhalants and nasal sprays.

24.     The Merger Consideration appears inadequate in light of the Company's recent financial performance.  Indeed, on March 1, 2017, the Company announced positive financial results for the 2016 fiscal year. Revenue increased 13%, GAAP Diluted EPS increased 20%, and Adjusted Diluted EPS increased 11%. CEO Raj Rai announced, "[i]n 2016, we achieved record revenues, surpassing a billion dollars and solidifying Akorn's position among the top specialty generics companies with manufacturing roots in the United States."

25.     Further, on March 2, 2017, Akorn announced that it has received approval from the U.S. Food and Drug Administration (FDA) for its New Drug Application for Ephedrine Sulfate Injection, USP 50 mg/mL in 1 mL single dose ampule.  Ephedrine sulfate injection is indicated for the treatment of clinically important hypotension occurring in the setting of anesthesia. FDA approval is critically important to pharmaceutical companies generally, and is viewed as the most critical issue facing Akorn.

26.     As a result of these events, financial analysts increased their price targets and upgraded Akorn's future outlook.

27.     In sum, it appears that the Merger Consideration fails to adequately compensate Akorn shareholders. It is therefore imperative that the Company's shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Merger.

II.     **The Merger Agreement's Deal Protection Provisions Deter Superior Offers**

28.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate

conjunctively to deter other suitors from submitting a superior offer for Akorn.

29.     First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Akorn shareholders. The Merger Agreement states that the Company and the Individual Defendants shall not: (i) initiate, solicit or knowingly encourage (including by way of furnishing non-public information) the submission of any inquiries regarding, or the making of, any proposal which constitutes, or would reasonably be expected to lead to, a takeover proposal; (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding (except to notify any person of the provisions regarding non-solicitation in the merger agreement), or furnish to any other person any non-public information in connection with, or for the purpose of, encouraging a takeover proposal; or (iii) enter into any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement or other similar agreement providing for a takeover proposal.

30.     Additionally, the Merger Agreement grants Fresenius recurring and unlimited matching rights, which provides it with unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid.

31.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Fresenius can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Fresenius, to the detriment of Akorn's public shareholders.

32.     Lastly, the Merger Agreement provides that Akorn must pay Fresenius a termination fee of $129 million in the event the Company elects to terminate the Merger

Agreement to pursue a superior proposal. The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Akorn shareholders with a superior offer.

33.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

34.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Akorn's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

## III.    The Materially Incomplete and Misleading Proxy

35.     On May 22, 2017 Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger. The Individual Defendants were obligated to carefully review the Proxy to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

36.     First, the Proxy fails to provide material information concerning the Company's financial projections. Specifically, the Proxy provides projections for non-GAAP (generally accepted accounting principles) metrics, including EBITDA and unlevered free cash flow, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

37.     When a company discloses non-GAAP financial measures in a Proxy, the

Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

38.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Akorn has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.   And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

39.     In recent months, the SEC has repeatedly emphasized that disclosure of non-

---

[1]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[3] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

40.     In order to make the projections included on page 48 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

41.     At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures EBITDA and unlevered free cash flow (*i.e.*, net income before deducting net interest expense, income tax expense, depreciation, amortization, stock-based compensation expense, projected taxes, capital expenditures, and net working capital). Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading. Indeed, the Defendants acknowledge that disclosing non-GAAP projections may mislead shareholders in the Proxy: "Due to the inherent limitations of non-GAAP financial measures, investors should consider non-GAAP measures

---

[2]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[3]     *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

only as a supplement to, not as a substitute for or as a superior measure to, measures of financial performance prepared in accordance with GAAP." Proxy 46.

42.     On page 48 of the Proxy, the Company claims that GAAP reconciliation cannot be made available without unreasonable efforts. This is a misstatement. Akorn regularly reconciles non-GAAP financial measures, including EBITDA, to GAAP net income in their earnings press releases prepared for investors. In fact, the Company has performed line item GAAP reconciliations in all of the earnings releases available on its website. Below is an excerpt from their most recent press release on March 1, 2017:

43.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 8.0% to 10.0%; (ii) the range of terminal values to which the growth rate range was applied; and (iii) the inputs and assumptions underlying the calculation of the terminal value growth rates.

44.     These key inputs are material to Akorn shareholders, and their omission renders the summary of J.P. Morgan's *Discounted Cash Flow Analysis* on page 44 of the Proxy incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For

example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions. *Id.* at 1577-78.

45. With respect to the potential conflicts of interest J.P. Morgan faced, the Proxy notes that they are an agent bank and a lender under outstanding credit facilities of Akorn, for which they receive "customary compensation or other financial benefits". Proxy at 45. Disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to 17 C.F.R. § 229.1015(b)(4). Such information is also material to Akorn shareholders. Indeed, it is imperative for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed merger must be carefully considered in assessing how much credence to give its analysis. A reasonable shareholder would want to know an important economic motivation of the advisor employed by a board to assess the fairness of the merger to shareholders, when that motivation could rationally lead that advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only approving a deal at truly fair price to shareholders. The omission of J.P. Morgan's specific compensation figures renders the vague reference to J.P. Morgan's compensation on page 45 of the Proxy incomplete and misleading.

46.     Further, the Proxy notes that J.P. Morgan was involved in multiple dealings with Fresenius' parent company, Fresenius SE & Co. KGaA ("Fresenius Parent"), for which it received "customary compensation." Proxy at 45. Specifically, J.P. Morgan acted as joint lead arranger and bookrunner on Fresenius Parent's €3.7 billion bridge loan that closed in January 2017 and joint lead bookrunner on Fresenius Parent's €2.6 billion debt securities offering that closed in January 2017. The failure to disclose the amount of compensation J.P. Morgan received for such services is a material omission and makes the Proxy misleading to Akorn shareholders. Moreover, these types of dealings place J.P. Morgan's interests on both sides of the merger. The failure to specify the exact amount of money J.P. Morgan received and may continue to receive from Fresenius Parent while acting as Akorn's financial advisor is a serious area of concern for Akorn shareholders.

47.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9, 17 C.F.R. § 244.100, and 17 C.F.R. § 229.1015(b)(4) Promulgated Thereunder)**

48.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a

national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

50.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

51.     SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure...not misleading." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

52.     17 C.F.R. § 229.1015(b)(4) requires disclosure of all material relationships between a company and its financial advisor and the compensation received by the advisor for

the last two years.

53.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

54.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.   Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; (ii) the valuation analyses performed by J.P. Morgan in support of its fairness opinion; and (iii) potential conflicts of interest J.P. Morgan faced as a result of its prior dealings with parties on both sides of the merger.

55.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

56.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that J.P. Morgan reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided

by J.P. Morgan as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and knew or should have known of the conflicts faced by J.P. Morgan.

57.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review J.P. Morgan's analyses in connection with their receipt of the fairness opinion, question J.P. Morgan as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

58.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

59.     Akorn is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

60.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations

and omissions are not corrected prior to the vote on the Proposed Merger.

61.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

62.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

63.     The Individual Defendants acted as controlling persons of Akorn within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Akorn, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

64.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

66. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

67. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

68. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

69. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 12, 2017

Respectfully submitted,

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com

/s/ *Lewis S. Kahn*
Lewis Kahn, Esq. (23805)
Kahn Swick & Foti, LLC
206 Covington Street
Madisonville, La 70447
Telephone:     (504) 455-1400
Facsimile:      (504) 455-1498


*Attorneys for Plaintiff*